UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

_____
T-MOBILE NORTHEAST LLC                                  )
(f/k/a OMNIPOINT                                        )
COMMUNICATIONS,  INC.); A Wholly                        )
Owned Subsidiary of T-Mobile USA, Inc.                  )
                                                        )
                    Plaintiff,                          )
v.                                                      )          Civil Action No.
                                                        )
                                                        )
THE TOWN OF WESTON,  THE TOWN                           )
OF WESTON ZONING BOARD OF                               )
APPEALS and WENDY KAPLAN                                )
ARMOUR, WINIFRED LI                                     )
and MARC MARGULIES  in their                            )
Capacities as members of the TOWN OF                    )
WESTON ZONING BOARD OF APPEALS)                         )
                                                        )
                    Defendants.                         )
_____)

## **COMPLAINT**

## **INTRODUCTION**

This action arises out of the unlawful denial by the Town of Weston  Zoning Board of

Appeals (the "Board") of an application by Omnipoint Communications, Inc., predecessor-in-

interest to T-Mobile Northeast LLC, a wholly owned subsidiary of T-Mobile USA, Inc., and

doing business as ("T-Mobile") for use and dimensional variances under the Town of Weston

Zoning Bylaw (the "By-Law")  to install, operate, and maintain a one hundred foot (100')

telecommunications monopole, disguised as a flagpole, with three (3) panel antennas[1], GPS and

Emergency 911 antennas located within the monopole and three equipment cabinets in a fenced

compound at the base of the Monopole (collectively, the "Facility").  The proposed Facility

---

[1]  The original T-Mobile application included a monopole with nine (9) panel antennas, but during the proceedings before the Board, the design was amended to utilize three internally-mounted antennas.

would be located at property leased by T-Mobile at 300 Conant Rd., Weston, Massachusetts (the "Property").  The Board's denial of T-Mobile's application for the requested relief violates § 704 of the Federal Telecommunications Act of 1996, 47 U.S.C. § 332(c).  Accordingly, T-Mobile seeks an injunction from this Court directing the Board to grant T-Mobile's application for the variances in accordance with T-Mobile's rights under the Federal Telecommunications Act of 1996.

In denying T-Mobile's application for the necessary zoning relief, the Board (i) ignored uncontroverted expert testimony concerning T-Mobile's significant gap in its coverage network within the Town of Weston, (ii) ignored the uncontroverted testimony and evidence concerning the lack of feasible alternatives available to T-Mobile to rectify its significant gap in network coverage and (iii) failed to consider whether the need to close a significant gap was necessary to avoid an effective prohibition of services.

The Board's failure to consider whether the need to close a significant gap was necessary to avoid an effective prohibition of services, as well as the Board's contention that T-Mobile had failed to demonstrate that it has a significant gap in its coverage in Weston, despite uncontroverted expert testimony proving the existence of such a gap, renders baseless the Board's decision.  Accordingly, the Town's denial of T-Mobile's request for zoning relief  is not based on substantial evidence as required pursuant to the Federal Telecommunications Act of 1996, 47 U.S.C. § 332(c).

The Board's denial of T-Mobile's application failed to consider the evidence in the record concerning the lack of feasible alternatives in the area.  The Board's failure was compounded by its insistence that a site on municipally owned property known as "Cat Rock" posed an alternative site, notwithstanding that T-Mobile postponed hearing on its application for zoning relief, at the Town's  request, for over a year, while the Town sought to make the "Cat

Rock" site available, only to have Weston Town Meeting vote not to make the site available for leasing.   The Board's reliance on the unavailable Cat Rock site, combined with the lack of any feasible alternative sites and the restrictions for wireless facilities imposed by the By-Law, would render futile future applications by T-Mobile seeking zoning relief necessary to remedy its coverage gap in Weston.   Consequently, the Board's denial of T-Mobile's application with respect to the Facility at the Property effectively prohibits T-Mobile from providing coverage to its current or potential subscribers in violation of the Federal Telecommunications Act of 1996, 47 U.S.C. § 332(c).

Section V.J.4.g of the By-Law, as drafted, includes an approval renewal provision requiring a wireless carrier to renew an approval every two (2) years.   Such a provision subjects wireless carriers, including T-Mobile, to a never-ending permitting process and expenditure of resources jumping through bureaucratic hoops just to maintain existing facilities, rather than continuing to grow and develop their networks to reach inadequately served areas and develop new services.   This provision has a real, substantial, and cumulative adverse impact on the provision of wireless telecommunications services within the Town which reaches far beyond the borders of the Town, as it creates a dynamic in which T-Mobile's network within the Town is in a potentially constant state of flux.   This provision of the By-Law regulates wireless communications providers in a discriminatory manner that is not applicable to all utility providers or otherwise seeks to regulate the entry of wireless communications providers into the market.   It therefore presents a barrier to, or the regulation of, entry in violation of the Federal Telecommunications Act of 1996, 47 U.S.C. § 332(c)(3)(A).   Accordingly, T-Mobile seeks permanent injunctive relief prohibiting the Town from enforcing Section V.J.4.g of the Bylaw.

975235.1

## THE PARTIES

1.      Plaintiff, T-Mobile Northeast LLC is a Delaware limited liability company and is the successor-in-interest to Omnipoint Communications, Inc.; both T-Mobile Northeast LLC, and Omnipoint Communications, Inc. are wholly owned subsidiaries of T-Mobile USA, Inc., a Delaware corporation with its principal place of business in Bellevue, Washington.  T-Mobile Northeast LLC, Omnipoint Communications, Inc. and T-Mobile USA, Inc., are registered to do business in the Commonwealth of Massachusetts and maintain an office at 15 Commerce Way, Suite B, Norton, Massachusetts.  At the time of the application and at all relevant times below, Omnipoint Communications, Inc., was the applicant.  Effective June 30, 2009 (after the date of the application and the Board's vote denying the same), due to an internal corporate reorganization, T-Mobile Northeast LLC acquired all or substantially all of the assets of Omnipoint Communications, Inc., including all right, title and interest arising from said application held in and by Omnipoint Communications, Inc.

2.      Defendant, the Town of Weston ("Weston" or the "Town") is a duly authorized municipality constituted and existing under the laws of the Commonwealth of Massachusetts.

3.      Defendant, the Board, is a duly authorized unit of the Town that has been delegated the authority, among other things, to grant use and dimensional variances under the Town's Zoning Bylaw.

4.      Defendants Wendy Kaplan Armour, Winifred Li and Marc Margulies served as the Board that denied the request for the use and dimensional variances at issue in this action. Each is named solely in his/her capacity as a Board member.

**JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1331, as this action arises under the laws of the United States, specifically § 704 of the Federal Telecommunications Act of 1996.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(b), since the Defendants each reside in this District, and the events giving rise to this action occurred in this District.

**FACTUAL BACKGROUND**

**The Wireless Service Technology**

7.      T-Mobile provides commercial mobile radio services, personal and advanced wireless services, as well as other telecommunications services as those terms are defined under federal law, in the New England market, which includes the Town of Weston.  T-Mobile is a Federally-licensed provider of personal wireless services, and is seeking to facilitate the development of a wireless telecommunications network in keeping with the goals of the Act, as defined below, and T-Mobile's licenses from the Federal Communications Commission ("FCC").  The licenses authorizing T-Mobile to provide wireless service in the Town of Weston were issued by the FCC pursuant to 47 U.S.C. §151.  Section 151 establishes a national policy to "make available, so far as possible, to all people of the United States, without discrimination… a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, [and] for the purpose of promoting safety of life and property through the use of wire and radio communications." 47 U.S.C. §151.  To meet these policy goals, T-Mobile seeks to provide personal wireless services to local businesses, public safety entities, and the general public.  To advance the national policies enumerated under 47 U.S.C. §151, T-Mobile must create and

maintain a network of "cell sites," each of which consists of antennas and related equipment designed to send and receive radio signals.

8.      Wireless service is important to public safety and convenience.  From 1996 to 2007, the number of wireless telephone users increased more than fivefold -- from 44 million to more than 255 million wireless subscribers.  *See FCC's Thirteenth Report to Congress on the State of Competition in the Commercial Mobile Radio Services Marketplace*, p. 131, Table A-1 (Jan. 16, 2009).  There are now more wireless subscriptions than landline telephone subscriptions in the United States.  At present the number of landline telephone subscribers across the nation is declining each year while the number of wireless users increases.

9.      For many Americans, wireless devices have become an indispensable replacement for traditional landline telephones.  Even when Americans maintain both types of telephone service, Americans are opting increasingly to use wireless devices over their landline telephones. From 1996 to 2004, Americans more than quadrupled their time spent talking on their cell phones, while markedly reducing the number of long-distance and local calls made over conventional landlines. From 2001 to mid-2007 the number of minutes of use by wireless subscribers in the US increased more than five fold from less than 200 billion minutes of use per year to more than a trillion minutes of use.

10.      For Americans living in "wireless-only" homes and for those others while away from their homes, cell phones are often their only lifeline in emergencies.  Between 1995 and 2006, the number of 911 calls made by people using wireless phones more than doubled, to over 50 million a year.  Public safety agencies estimate that approximately 50% of the millions of 911 calls they receive daily are placed from cell phones, and the percentage is growing.  *See FCC Consumer Facts, Wireless 911 (last updated on Oct. 17, 2008).*

11.     Unlike cellular services using analog-based systems, digital technology converts voice or data signals into a stream of digits to allow a single radio channel to carry multiple simultaneous signal transmissions.  This allows T-Mobile to offer services unavailable in analog-based systems, such as secured transmissions and enhanced voice, high-speed data, paging and imaging capabilities as well as voice mail, call forwarding and call waiting.

12.     Wireless devices utilizing all digital technology operate by transmitting a radio signal to antennas mounted on a tower, pole, building, or other structure.  The antenna feeds the signal to electronic devices housed in a small equipment cabinet, or base station.  The base station is connected by microwave, fiber optic cable, or ordinary telephone wire to a base station controller, subsequently routing the calls throughout the world.

13.     The traditional analog carriers use spectrum in the 850 megahertz range while the newer providers, like T-Mobile operate on Personal Communications Service ("PCS") frequencies in the 1.9 gigahertz band and in the Advanced Wireless Services ("AWS") frequencies in the 1.7 and 2.1 gigahertz bands. Because the PCS and AWS systems have a lower signal strength and operates at much higher frequency bands than traditional analog cellular technology, the effective communications range between a handheld wireless device and the call site is limited.

14.     In order to provide reliable service to a user, coverage must overlap in a grid pattern resembling a honeycomb.  If T-Mobile is unable to construct a "cell site" within a specific geographic area, T-Mobile will not be able to provide service to the consumers within that area.

15.     T-Mobile's engineers use complex computer programs and extensive field testing to complete a propagation study, which shows where cell sites need to be located in order to provide service.  The propagation study also takes into account the topography of the land, the

coverage boundaries of neighboring cells and other factors.  In order for the entire network to be operational, there must be properly placed cell sites installed and functioning so that reliable coverage can be realized, and only when the entire system is operational will a user have service and an uninterrupted conversation throughout a given territory.  If there is no functioning cell site within a given area, there will be no service for customers within that area, and mobile customers who travel into the area will experience an unacceptable level of dropped calls.

16.     Based upon T-Mobile's research and analysis, T-Mobile determined that it has a significant gap in coverage in Weston, specifically in the area around State Route 117 and its surrounding areas.  This coverage gap has been deemed significant by T-Mobile and its radio frequency engineering department and must be remedied in order to provide reliable service coverage.

17.     T-Mobile determined that, because of its location, size and unique topography, and the lack of feasible alternatives, the Property provided the optimal site within Weston  to remedy its coverage gap and to provide coverage consistent with the dictates of its FCC license requirements.

18.     T-Mobile has had a significant gap in coverage with respect to this section of the Town and has explored a number of potential sites for a wireless telecommunications facility, without success, prior to its application for the instant use and dimensional variances.

**Federal Statutory Control Over PCS Siting**

19.     Section 704 of the Federal Telecommunications Act of 1996 (the "Act"), 47 U.S.C. § 332(c), governs federal, state and local government regulation of the siting of personal wireless service facilities such as the one at issue here.

20.     The Act further provides that any person adversely affected by a state or local government's act, or failure to act, that is inconsistent with § 332(c)(7) of the Act may seek expedited review in the federal courts.  47 U.S.C. § 332(c)(7)(B)(v).

## The Zoning By-Law

21.     The Property is located within the Residential C zoning district as defined under the Bylaw. Under Sections V.J.3 of the Bylaw, personal wireless facilities are permitted only within of two Personal Wireless Service Overlay Districts (PWSOD I and PWSOD II ) identified in the Bylaw, or alternatively, where such facilities are completely enclosed within a religious or municipal building in existence on or before December 8, 1997.

22.     A personal wireless facility that includes a tower, such as the monopole at issue in this case, is permitted only in the PWSOD I district.

23.     Section V.J.2 of the Bylaw provides that a tower may not exceed 100 feet in height if it is beyond the PWSOD I district.

24.     The proposed Facility is not located within the PWSOD district.

## T-Mobile's Application under the Zoning Bylaw &
## Telecommunications Act of 1996

25.     On or about November 16, 2007, T-Mobile formally applied to the Board for a use variance, allowing it to site its Facility beyond  PWSOD I and PWSOD II, as defined in Section V. J.3 of the Bylaw, and in a district where using the Property for a wireless communications facility is not permitted. Additionally, T-Mobile sought, in its application, to construct and install a monopole, the height of which exceeds the height requirements set forth in Section IV.E.2.c of the Bylaw.

26.     T-Mobile's application to the Board met all of the requirements of the Bylaw, M.G.L. ch. 40A and the Telecommunications Act for the issuance of the requested variances.

27.     Moreover, T-Mobile demonstrated that a literal enforcement of the provisions of the Bylaw would prevent T-Mobile from eliminating an existing gap in its wireless coverage, resulting in a potential loss of subscribers and the inability to compete for subscribers with FCC licensed competitors in the market, contrary to the intent of the Bylaw and the Federal Telecommunications Act.

28.     The Board held hearings on January 28, 2008, March 3, 2008 and April 28, 2008. During the course of these hearings, T-Mobile provided evidence and testimony, including radio frequency drive testing data and radio frequency coverage plots for the proposed facility at the Property, as well as radio frequency coverage plots for alternative facilities.

29.     In order to address the Board's concerns regarding aesthetic issues, T-Mobile proposed a flagpole style monopole of the same height as the flagpole at the Weston Town Hall, which pole would not have to be marked or lit.

30.     At the urging of the Board, T-Mobile agreed to work with the Board to explore a possible site at Cat Rock as an alternative to the site at the Property.

31.     Notwithstanding that the Cat Rock site falls outside PWSOD, the Board indicated to T-Mobile that it would approve a one hundred foot monopole at that location.

32.     As a result of these discussions, T-Mobile agreed that it would postpone its request for zoning relief and work with the Town of Weston toward locating its Facility at the municipally owned Cat Rock location, with the understanding that, should that location prove to be unavailable, it would move forward with its application for the zoning relief necessary to locate its Facility at the Property.

33.     In order to offer the municipally owned Cat Rock site for use as a wireless communications facility, the Town of Weston was required to draft a formal Request for

Proposal (RFP) and list the RFP in the Commonwealth of Massachusetts' Central Registry, a state listing for public procurement.

34.     T-Mobile sought to have the Town of Weston issue the necessary RFP for the Cat Rock site following the April 28, 2008 public hearing until April, 2009, at which time the RFP was completed and sent to the Central Registry.

35.     During this nearly one year period, with the encouragement of the Board, T-Mobile agreed to postpone further hearing on its application for zoning relief at the Property.

36.     Consistent with Commonwealth of Massachusetts public procurement policy, the RFP was published in April, 2009, with proposals due to the Town of Weston by May 22, 2009.

37.     The approval, by  a two-thirds vote, at Weston Town Meeting is required as a prerequisite to the Town's accepting the RFP and leasing municipal property for the purpose of locating a wireless communications facility at the Cat Rock site.

38.     On May 13, 2009, the Weston Town Meeting failed to approve the Town Meeting Warrant Article necessary for accepting the RFP, effectively foreclosing the Cat Rock property as an alternative site for T-Mobile's Facility.

39.     On June 29, 2009, the Board held further public hearing on T-Mobile's application for a use variance and a dimensional variance at the Conant Road Property.

40.     At the June 29, 2009 hearing, the Board's radio frequency consultant confirmed that T-Mobile's radio frequency data had demonstrated the weakness of its signal strength along Route 117 in Weston and confirmed that the proposed Facility would remedy a portion of the coverage gap in that area.

41.     Notwithstanding that T-Mobile had introduced uncontroverted evidence, over the course of four hearings,  concerning the magnitude of a significant gap in its coverage, its search for appropriate alternative sites and the lack of feasible alternative sites,  the Board asked if T-

Mobile would continue its zoning request for an additional five months, so that a new Town Meeting Warrant Article could be brought to Town Meeting in November, 2009 for the Cat Rock site.

42.    T-Mobile declined to wait further for the possibility that the site would be approved at Weston's November, 2009 Town Meeting, as by then two years would have elapsed since its initial application and because it had met the requirements of the Bylaw, state zoning law and the Telecommunications Act for the issuance of the use and dimensional variances for which it had applied.

43.    Following its June 28, 2009 hearing, the Board brought T-Mobile's request for zoning relief to a vote.

44.    The Board denied T-Mobile's request for a use variance and a dimensional variance by a vote of 3-0.

45.    In the Board's decision, it contended, without evidentiary support, that T-Mobile "had not demonstrated a significant gap in service". Further, it contended that T-Mobile had not presented "sufficient information to prove that there is not another site available that could serve as an alternative. The Board also recognized that the Cat Rock site may become available in a reasonable time."

46.    The Board's decision was filed with the Town Clerk's office on July 15, 2009. A true and accurate copy of the Board's decision is attached hereto as Exhibit A.

### **Weston's Bylaw Violates the Telecommunications Act**

47.    Section V.J.4.g of the By-Law provides that "[s]pecial permits authorized under this section shall be limited to an initial term of two years and shall be renewed every two years thereafter provided the special permit holder has filed with the Board

annual certification demonstrating continuing compliance with the special permit and with applicable federal state regulatory requirements."

48.    The Town has imposed this or similar renewal requirements even, where as here, the applicant required and obtained a use variance to permit its proposed wireless communications facility.

49.    Thus, even despite an approval of a proposed facility, a wireless communications provider has no reasonable expectation that such facility may be permitted to be in operation long enough to recoup the significant development, permitting, construction, and continuing compliance costs, demanded by the By-Law.

50.    Further, the two (2) year renewal requirement, creates an endless cycle of uncertainty and permitting contrary to the goals of the Act.  No other utility, including a land line telephone provider, is subject to such a regulation and as such, this provision of the By-Law is applied to wireless communications providers in a discriminatory fashion.

51.    The By-Law's regulatory framework subjects T-Mobile to the potential need to attempt to relocate this Facility, or its replacement, every two (2) years.

52.    Such a requirement is clearly contrary to the Act's intent and purpose to provide for a pro-competitive, deregulatory national policy framework designed to accelerate rapid private sector deployment of advanced telecommunications and information technologies.  As a result, the Act seeks to reduce the regulation and bureaucracy hindering the provision of wireless communications services.

53.    The Act clearly does not intend for carriers to be subject to a never-ending permitting process and expending resources jumping through bureaucratic hoops just to maintain existing facilities, rather than continuing to grow and develop their networks to reach inadequately served areas and develop new services.

54.    The only way to avoid this vicious cycle is for T-Mobile to choose not to provide coverage to significant gaps in its coverage network that require facilities to be located within the Town, such as the Facility at issue here. However, this would leave T-Mobile unable to provide telecommunications service to significant areas within the Town. Accordingly, the By-Law operates as a barrier to, and regulation of, T-Mobile's entry into Weston in violation of the Act.

55.    Moreover, the renewal requirement operates as an additional barrier to, and regulation of, entry in that it adversely impacts overall network planning.

56.    Just as the proposed Facility is designed to work in conjunction with existing facilities, so too will future facilities be designed to work in conjunction with the proposed Facility.

57.    Accordingly, the location of the Facility will have a real and substantial impact on the development and location of future facilities. The Facility, and any future sites within the Town to which the Facility may connect, will effectively always be in a state of flux, thereby making it difficult to identify network needs and plan additional sites that connect to, or are near, the Town.

58.    Consequently, although the impact of this provision of the By-Law is a discriminatory regulation of the entry of wireless communications providers into the market within the Town is clear, it has a further cumulative impact on the provision of wireless telecommunications services that reaches far beyond the borders of the Town.

## COUNT I - TELECOMMUNICATIONS ACT OF 1996
### (Substantial Evidence)

59.    T-Mobile hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 58 above as if fully set forth herein.

60.     Pursuant to 47 U.S.C. § 332(c)(7)(B)(iii): "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

61.     T-Mobile has fulfilled all of the criteria required by the Act and the Bylaw in order to receive the relief for which it applied.

62.     T-Mobile introduced uncontroverted evidence concerning the existence of a significant gap in its coverage in the area near State Route 117 in Weston.

63.     In denying T-Mobile's request for zoning relief, the Board contended, without support, that T-Mobile had failed to demonstrate the existence of a significant gap in coverage.

64.     In denying the T-Mobile's request for zoning relief, the Board contended that T-Mobile had had not presented sufficient information to prove that there is not another site available that could serve as an alternative.  To support this erroneous proposition, the Board relied on the proposition that "Cat Rock site may become available in a reasonable time."

65.     By ignoring the existence of T-Mobile's significant gap in coverage and relying on an "alternative" site that had been refused by its Town Meeting, the Board's denial of T-Mobile's request for zoning relief is unsupported by factual evidence.

66.     Accordingly, the Board's decision is not "supported by substantial evidence contained in a written record."  47 U.S.C. § 332 (c)(7)(B)(iii).

67.     Consequently, the Board's action is in violation of, and preempted by, the Act and the Supremacy Clause, and should be set aside and enjoined by the Court on that basis.  Further, this Court should exercise its power to issue an order commanding the Board to grant the variances for which T-Mobile applied.

## COUNT II - TELECOMMUNICATIONS ACT OF 1996
### (Effective Prohibition)

68.     T-Mobile hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 67 above as if fully set forth herein.

69.     Article VI, Clause 2, of the United States Constitution, commonly known as the Supremacy Clause, provides, in relevant part, that "[t]his Constitution and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the Supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

70.     The Act governs the regulation of the placement, construction, and modification of personal wireless service facilities and, under the Supremacy Clause, preempts state laws and municipal ordinances or Ordinance affecting such facilities to the extent that such laws, ordinances, and Ordinance conflict with the Act.

71.     T-Mobile's application for a use variance and a dimensional variance constitutes a request to provide "personal wireless services" within the meaning of the Act, and, as such, is entitled to the protection of the Act.

72.     Pursuant to 47 U.S.C. § 332(c)(7)(B), the "regulation of the placement, construction and modification of personal wireless service facilities by any State or local government or instrumentality thereof …(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services".

73.     T-Mobile investigated alternative sites in and around the area of Weston within which its engineers determined that a coverage gap exists and that a monopole must be located to fill the gap in service coverage and to function effectively within T-Mobile's network of existing and planned facilities.

74.     No existing structure or property in or near the vicinity of the proposed Monopole is feasible to remedy the gap in T-Mobile's coverage.

75.     The Board's denial of the zoning relief sought by T-Mobile, given the (i) existence of a significant gap in coverage and (ii) the lack of reasonably feasible alternatives in the area, effectively prohibits T-Mobile from providing coverage to its current or potential subscribers.

76.     The Board's refusal to acknowledge the uncontroverted evidence of T-Mobile's significant coverage gap in the area near State Route 117, its refusal to acknowledge clear evidence that there are no reasonably feasible alternatives to the proposed Facility at the Conant Road Property to remedy this gap in coverage, and its contention that Cat Rock poses such an "alternative site" renders any further applications for a site to cover this significant gap in T-Mobile's coverage network fruitless to attempt.

77.     Consequently, the Board's denial of T-Mobile's application for a use and dimensional variance violated the Act's requirement that state or local governments not prohibit or effectively prohibit the provision of personal wireless services.  47 U.S.C. § 332(c)(7)(B)(II)

## COUNT III - TELECOMMUNICATIONS ACT OF 1996
### (The Wireless Ordinance as a Barrier to Entry)

78.     T-Mobile hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 77 above as if fully set forth herein.

79.     Pursuant to 47 U.S.C. § 332(c)(3)(A) "no State or local government shall have any authority *to regulate the entry of*… any commercial mobile service". (Emphasis added).

80.     Section V.J.4.g of the By-Law subjects wireless carriers, including T-Mobile, to a never-ending permitting process and expenditure of  resources jumping through bureaucratic hoops just to maintain existing facilities, rather than continuing to grow and develop their networks to reach inadequately served areas and develop new services.  This provision has a real, substantial, and cumulative adverse impact on the provision of wireless telecommunications

services within the Town which reaches far beyond the borders of the Town, as it creates a dynamic in which T-Mobile's network within the Town is in a potentially constant state of flux which amounts to a regulation of entry and a substantial barrier to wireless telecommunications service in violation of 47 U.S.C. § 332(c)(3)(A).  It should therefore be declared invalid and unenforceable in its entirety.

81.    As an FCC-licensed provider of personal wireless services, including telecommunications services, and the type of entity toward whom the By-Law is specifically directed, T-Mobile is uniquely impacted by the enforcement of the By-Law.

82.    Accordingly, the Section V.J.4.g of the By-Law is in violation of, and preempted by, the Act and the Supremacy Clause, and should be set aside and enjoined by the Court on that basis.  Further, this Court should exercise its power to issue a permanent injunction prohibiting the enforcement of the Section V.J.4.g of the By-Law.

**WHEREFORE**, T-Mobile respectfully requests the following relief as against the defendants:

1.    An expedited review of the matters set forth in this Complaint;

2.    An injunction mandating that the Board grant approval of the use variance and dimensional variance for which T-Mobile applied;

3.    An injunction directing the Town, through its officers and agents, to issue all ancillary permits, including, without limitation, the use variance and dimensional variance for which T-Mobile applied, as well as a building permit for construction of the Facility proposed on the Property and all accompanying equipment sought in T-Mobile's the application for said variances that is the subject of this action;

4.    A judgment that the Defendants' actions and decisions violated the Act and are therefore void and invalid;

5.      A judgment that Section V.J.4.g of the By-Law presents an impermissible barrier to, or regulation of, entry in violation of 47 U.S.C. 332(c)(3)(A) and that T-Mobile is entitled to a permanent injunction prohibiting the Town, the Board, and any other Boards, or their agents from enforcing Section V.J.4.g of the of the Bylaw;

6.      An award of T-Mobile's costs of suit herein, including reasonable attorneys' fees; and

7.      Such other and further relief as the Court may deem just and proper.


**T-MOBILE NORTHEAST LLC**
**(f/k/a OMNIPOINT COMMUNICATIONS, INC.)**
A Wholly Owned Subsidiary of T-Mobile USA, Inc.
By its attorneys,

*/s/ Brian S. Grossman*
William A. Worth, BBO # 544086
Brian Grossman, BBO #641159
PRINCE, LOBEL, GLOVSKY & TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114
Telephone:  (617) 456-8000
Fax:  (617) 456-8100
wworth@princelobel.com
bgrossman@princelobel.com


Dated:  August 14, 2009